# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | 12-md-02311<br>Honorable Marianne O. Battani |
| PRODUCT(S): | 2:14-cv-02902-MOB-MKM |
| Automotive Constant-Velocity-Joint Boot Products | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| This Document Relates to: | JURY TRIAL DEMANDED |
| ALL DEALERSHIP ACTIONS | |

## DEALERSHIP CONSOLIDATED CLASS COMPLAINT

Martens Cars of Washington, Inc. ("Plaintiff Martens"), Landers Auto Group No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers"), Hammett Motor Company, Inc. ("Plaintiff Hammett"), Superstore Automotive, Inc. ("Plaintiff Superstore"), Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"), V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."), Desert European Motorcars, Ltd. ("Plaintiff Desert"), Dale Martens Nissan Subaru, Inc. ("Plaintiff Dale Martens"), Green Team of Clay Center Inc. ("Plaintiff Green Team"), McGrath Automotive Group, Inc. ("Plaintiff McGrath"), Table Rock Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"), Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"), Bonneville and Son, Inc. ("Plaintiff Bonneville"), Holzhauer Auto and Truck Sales, Inc. ("Plaintiff Holzhauer"), Pitre, Inc., d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"), Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou"), John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene"), SLT Group II, Inc., d/b/a Planet Nissan Subaru of Flagstaff ("Plaintiff Planet Nissan"), Herb Hallman Chevrolet, Inc., d/b/a/

Champion Chevrolet ("Plaintiff Champion"), Charles Daher's Commonwealth Motors, Inc., d/b/a Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda ("Plaintiff Commonwealth Motors"), Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"), Commonwealth Nissan, Inc., d/b/a Commonwealth Nissan ("Plaintiff Commonwealth Nissan"), Ramey Motors, Inc. ("Plaintiff Ramey"), Thornhill Superstore, Inc.,  d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"), Dave Heather Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland"), Central Salt Lake Valley GMC Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"), Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"), Capitol Dealerships, Inc., d/b/a Capitol Toyota ("Plaintiff Capitol Toyota"), Beck Motors, Inc. ("Plaintiff Beck"), Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"), John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"), Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley"), Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"), Lee Auto Malls-Topsham, Inc. d/b/a Lee Toyota of Topsham ("Plaintiff Topsham"), Landers of Hazelwood, LLC d/b/a Landers Toyota of Hazelwood ("Plaintiff Hazelwood"), Cannon Chevrolet – Oldsmobile – Cadillac – Nissan, Inc. ("Plaintiff Cannon"), Cannon Nissan of Jackson, LLC ("Plaintiff Cannon Nissan"), Hudson Charleston Acquisition, LLC d/b/a Hudson Nissan ("Plaintiff Hudson Nissan"), Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer"), Apex Motor Corporation ("Plaintiff Apex"), Hudson Gastonia Acquisition, LLC ("Plaintiff Gastonia Nissan"); HC Acquisition, LLC d/b/a Toyota of Bristol ("Plaintiff Bristol Toyota"), Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"), Reno Dodge Sales, Inc. d/b/a Don Weir's Reno Dodge ("Plaintiff Don Weir"), Panama City Automotive Group, Inc. d/b/a John Lee Nissan ("Plaintiff John Lee"), Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"), Scotland Car Yard Enterprises

d/b/a San Rafael Mitsubishi ("Plaintiff San Rafael"), and Westfield Dodge City, Inc. ("Plaintiff Westfield") (collectively "Plaintiffs"), file this Class Action Complaint on behalf of themselves and all others similarly situated (the "Classes" as defined below).

Plaintiffs bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state unjust enrichment, antitrust, unfair competition, and consumer protection laws, demand a trial by jury, and allege as follows:

## NATURE OF ACTION

1.      This lawsuit is brought as a proposed class action against Defendants Toyo Tire & Rubber Co., Ltd., and Toyo Automotive Parts (USA), Inc. (collectively, "Toyo" or "Defendants") and unnamed co-conspirators, manufacturers and/or suppliers of Automotive Constant-Velocity-Joint Boot Products (defined below) for engaging in a long-running conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Automotive Constant-Velocity-Joint Boot Products.

2.      Plaintiffs seek to represent all automobile dealers who, during the period from and including January 1, 2006 through the present (the "Class Period"), purchased vehicles[1] containing one or more Automotive Constant-Velocity-Joint Boot Product(s) as a component part, or indirectly purchased one or more Automotive Constant-Velocity-Joint Boot Product(s) as a replacement part, which were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants or any co-conspirator of the Defendants.

---

[1]   "Vehicles" as used here, means any new vehicles purchased by automobile dealers throughout the United States, including but not limited to sedans, trucks and sport utility vehicles.

3.     "Automotive Constant-Velocity-Joint Boot Products" are composed of rubber or plastic, and are used to cover the constant-velocity-joints of an automobile to protect the joints from contaminants.

4.     The Defendants manufacture, market, and sell Automotive Constant-Velocity-Joint Boot Products throughout and into the United States.  Defendants and other co-conspirators (as yet unknown) agreed, combined and conspired to fix, raise, maintain and/or stabilize prices, rig bids and allocate market shares for Automotive Constant-Velocity-Joint Boot Products.

5.     The U.S. Department of Justice's ("DOJ") Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.  The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct.  The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.4 billion in criminal fines.  The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several automotive parts manufacturers.

6.     On November 26, 2013, the DOJ announced that Defendant Toyo Tire & Rubber Co., Ltd. agreed to plead guilty and pay a $120 million criminal fine for its role in a conspiracy to fix prices of Automotive Constant-Velocity-Joint Boot Products, and another automotive part, installed in automobiles sold in the United States and elsewhere.

7.     In addition to the fact that Defendant Toyo Tire & Rubber Co., Ltd. agreed to plead guilty and agreed on its own behalf and on behalf of its subsidiaries to cooperate in the DOJ's investigation, one of its high-ranking executives has pleaded guilty to criminal price-fixing in the automotive parts industry and several others have been criminally indicted.  On November 21, 2003, the DOJ announced that  Tetsuya Kunida, a former executive of Defendant Toyo Tire & Rubber Co., Ltd., agreed to serve 12 months and one day in a U.S. prison, and to pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information for his role in a conspiracy to rig bids for, and to fix, raise, and maintain the prices of anti-vibration rubber products sold to automobile and component manufacturers in the United States and elsewhere.

8.     The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Constant-Velocity-Joint Boot Products sold to automobile manufacturers and others in the United States.  The combination and conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection and unjust enrichment laws.

9.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against the Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).   Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition and consumer protection laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations of those state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

12.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

13.     This Court has *in personam* jurisdiction over the Defendants because the Defendants, either directly or through the ownership and/or control of their subsidiaries, *inter*

*alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Automotive Constant-Velocity-Joint Boot Products throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; (d) targeted customers in the United States, including in this District; or (e) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  The Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

14.     The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

15.     The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. The Defendants' products are sold in the flow of interstate commerce.

16.     Automotive Constant-Velocity-Joint Boot Products manufactured abroad by the Defendants and sold for use in automobiles in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Automotive Constant-Velocity-Joint Boot Products are purchased in the United States, and such Automotive Constant-Velocity-Joint Boot Products do not constitute import commerce, the Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States

commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

17.     By reason of the unlawful activities hereinafter alleged, the Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  The Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Automotive Constant-Velocity-Joint Boot Products, which conspiracy unreasonably restrained trade and adversely affected the market for Automotive Constant-Velocity-Joint Boot Products.

18.     The Defendants' conspiracy and wrongdoing described herein adversely affected automobile dealers in the United States.


## PARTIES

### Plaintiffs

19.     Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi.  Plaintiff Hammett is an authorized Ford dealer who bought Ford-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, during the Class Period.

20.     During the Class Period, Plaintiff Hammett purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by Defendants or their co-conspirators.  Plaintiff Hammett also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by Defendants or their co-conspirators, for its repair and service

business, during the Class Period.  Plaintiff Hammett purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Mississippi. Plaintiff Hammett has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

21.     Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas.  Plaintiff Landers is an authorized Toyota dealer who bought Toyota-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, during the Class Period.

22.     During the Class Period, Plaintiff Landers purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Landers also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Landers purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Arkansas. Plaintiff Landers has also displayed, sold, serviced, and advertised its vehicles in Arkansas during the Class Period.

23.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota.  Plaintiff Superstore is an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore.  Plaintiff Superstore bought Buick- and GMC-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-

Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

24.      During the Class Period, Plaintiff Superstore purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Superstore also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Superstore purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Minnesota.  Plaintiff Superstore has also displayed, sold, serviced, and advertised its vehicles in Minnesota during the Class Period.

25.      Plaintiff Martens is a Maryland corporation that had its principal place of business in the District of Columbia during the Class Period.  During the Class Period Plaintiff Martens was an authorized Volvo and Volkswagen dealer who sold Volvo- and Volkswagen-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by one or more of the Defendants or their co-conspirators.

26.      During the Class Period Plaintiff Martens purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more of the Defendants or their co-conspirators.  Plaintiff Martens also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Martens purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-

Joint Boot Products in the District of Columbia.  Plaintiff Martens has also displayed, sold,

serviced, and advertised its vehicles in the District of Columbia during the Class Period.

     27.    Plaintiff Lee is a Florida corporation, with its principal place of business in Fort

Walton Beach, Florida.  Plaintiff Lee is presently an authorized GMC dealer.  During the Class

Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer.  Plaintiff Lee

buys GMC-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products

manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-

Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators.  During

the Class Period, Plaintiff Lee bought GMC-, Pontiac-, Oldsmobile-, and Jeep-brand vehicles

containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants

or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products

manufactured by the Defendants or their co-conspirators.

     28.    During the Class Period, Plaintiff Lee purchased vehicles containing Automotive

Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-

conspirators.  Plaintiff Lee also purchased Automotive Constant-Velocity-Joint Boot Products,

manufactured by one or more Defendants or their co-conspirators, for its repair and service

business, during the Class Period.  Plaintiff Lee purchased and received both the afore-

mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Florida.  Plaintiff

Lee has also displayed, sold, serviced, and advertised its vehicles in Florida during the Class

Period.

     29.    Plaintiff V.I.P. is a California company with its principal place of business in

Palm Springs, California.  Plaintiff V.I.P. is an authorized Mercedes, BMW, Infiniti, and

Hyundai dealer who bought Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing

Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

30.     During the Class Period, Plaintiff V.I.P. purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff V.I.P. also purchased Automotive Constant-Velocity-Joint Boot Products, for its repair and service business, during the Class Period.  Plaintiff V.I.P. purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in California.  Plaintiff V.I.P. has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

31.     Plaintiff Desert is a California company, with its principal place of business in Rancho Mirage, California.  Plaintiff Desert is an authorized Rolls Royce, Bentley, Aston Martin, Maserati, Porsche, Jaguar, Land Rover, Audi, Lotus, and Spyker dealer who bought Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus-, and Spyker-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

32.     During the Class Period, Plaintiff Desert purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Desert also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Desert purchased and received both the afore-

mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in California. Plaintiff Desert has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

33.    Plaintiff Dale Martens was a Kansas corporation, with its principal place of business in Lawrence, Kansas during the Class Period.  Plaintiff Dale Martens was an authorized Nissan and Subaru dealer during the Class Period, who, during the Class Period, bought Nissan- and Subaru-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators.

34.    During the Class Period, Plaintiff Dale Martens purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Dale Martens also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Dale Martens purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Kansas.  Plaintiff Dale Martens has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

35.    Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas.  Plaintiff Green Team is an authorized Chrysler, Jeep, Dodge, and Ram dealer, who bought Chrysler-, Jeep-, Dodge-, and Ram-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, during the Class Period.

36.     During the Class Period, Plaintiff Green Team purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Green Team also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Green Team purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Kansas. Plaintiff Green Team has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

37.     Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa.  Plaintiff McGrath is an authorized Buick, GMC, Chevrolet, Chrysler, Dodge, Jeep, Ram, Kia, and Cadillac dealer, who bought Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia-, and Cadillac-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

38.     During the Class Period, Plaintiff McGrath purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff McGrath also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff McGrath purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Iowa. Plaintiff McGrath has also displayed, sold, serviced, and advertised its vehicles in Iowa during the Class Period.

39.     Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska.  Plaintiff Table Rock is an authorized Hyundai dealer, who bought Hyundai-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, during the Class Period.

40.     During the Class Period, Plaintiff Table Rock purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured one or more Defendants or their co-conspirators.  Plaintiff Table Rock also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Table Rock purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Nebraska.  Plaintiff Table Rock has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

41.     Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska.  Plaintiff Archer-Perdue is an authorized Suzuki dealer, who, during the Class Period, has bought Suzuki-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators.

42.     During the Class Period, Plaintiff Archer-Perdue purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Archer-Perdue also purchased Automotive Constant-Velocity-

Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Archer-Perdue purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Nebraska.  Plaintiff Archer-Perdue has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

43.     Plaintiff Bonneville is a New Hampshire corporation, with its principal place of business in Manchester, New Hampshire.  Plaintiff Bonneville is an authorized Dodge, Chrysler, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

44.     During the Class Period, Plaintiff Bonneville purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Bonneville also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Bonneville purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in New Hampshire.  Plaintiff Bonneville has also displayed, sold, serviced, and advertised its vehicles in New Hampshire during the Class Period.

45.     Plaintiff Holzhauer is a Delaware corporation, with its principal place of business in Nashville, Illinois.  Plaintiff Holzhauer is an authorized Dodge, Chrysler, and Jeep dealer, who bought Dodge-, Chrysler-, and Jeep-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as

Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

46.     During the Class Period, Plaintiff Holzhauer purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Holzhauer also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Holzhauer purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Illinois. Plaintiff Holzhauer has also displayed, sold, serviced, and advertised its vehicles in Illinois during the Class Period.

47.     Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico.  Plaintiff Pitre is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, during the Class Period.

48.     During the Class Period, Plaintiff Pitre purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Pitre also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Pitre purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in New Mexico.

Plaintiff Pitre has also displayed, sold, serviced, and advertised its vehicles in New Mexico during the Class Period.

49.   Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan.  Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, during the Class Period.

50.   During the Class Period, Plaintiff Patsy Lou purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Patsy Lou also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Patsy Lou purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Michigan.  Plaintiff Patsy Lou has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

51.   Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene is an authorized Chrysler, Dodge, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

52.   During the Class Period, Plaintiff John Greene purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or

their co-conspirators.  Plaintiff John Greene also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff John Greene purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in North Carolina.  Plaintiff John Greene has also displayed, sold, serviced, and advertised its vehicles in North Carolina during the Class Period.

53.      Plaintiff Planet Nissan is an Arizona corporation, with its principal place of business in Flagstaff, Arizona.  Plaintiff Planet Nissan is an authorized Nissan and Subaru dealer, who bought Nissan- and Subaru-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

54.      During the Class Period, Plaintiff Planet Nissan purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Planet Nissan also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Planet Nissan purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Arizona.  Plaintiff Planet Nissan has also displayed, sold, serviced, and advertised its vehicles in Arizona during the Class Period.

55.      Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by

the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot

Products manufactured by the Defendants or their co-conspirators during the Class Period.

56.     During the Class Period, Plaintiff Champion purchased vehicles containing

Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or

their co-conspirators.  Plaintiff Champion also purchased Automotive Constant-Velocity-Joint

Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair

and service business, during the Class Period.  Plaintiff Champion purchased and received both

the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Nevada.

Plaintiff Champion has also displayed, sold, serviced, and advertised its vehicles in Nevada

during the Class Period.

57.     Plaintiff Commonwealth Motors is a Delaware corporation, with its principal

place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Motors is an authorized

Chevrolet, Honda, and Kia dealer, who bought Chevrolet-, Honda-, and Kia-brand vehicles

containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants

or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products

manufactured by the Defendants or their co-conspirators during the Class Period.

58.     During the Class Period, Plaintiff Commonwealth Motors purchased vehicles

containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more

Defendants or their co-conspirators.  Plaintiff Commonwealth Motors also purchased

Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or

their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff

Commonwealth Motors purchased and received both the afore-mentioned vehicles and

Automotive Constant-Velocity-Joint Boot Products in Massachusetts.  Plaintiff Commonwealth

Motors has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

59.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Volkswagen-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

60.     During the Class Period, Plaintiff Commonwealth Volkswagen purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Volkswagen also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Volkswagen purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Massachusetts.  Plaintiff Commonwealth Volkswagen has also displayed, sold, serviced and advertised its vehicles in Massachusetts during the Class Period.

61.     Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in the Lawrence, Massachusetts.  Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

62.     During the Class Period, Plaintiff Commonwealth Nissan purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Nissan also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Nissan purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Massachusetts.  Plaintiff Commonwealth Nissan has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

63.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia.  Plaintiff Ramey is an authorized Toyota, Chrysler, Dodge, Jeep, and Ram dealer, who bought Toyota-, Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

64.     During the Class Period, Plaintiff Ramey purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Ramey also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Ramey purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in West Virginia.  Plaintiff Ramey has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

65.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia.  Plaintiff Thornhill is an authorized Chevrolet, Buick, and GMC dealer, who bought Chevrolet-, Buick-, and GMC-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

66.     During the Class Period, Plaintiff Thornhill purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Thornhill also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Thornhill purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in West Virginia.  Plaintiff Thornhill has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

67.     Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin.  Plaintiff Lakeland is an authorized Toyota, Honda, Mazda, and Subaru dealer who bought Toyota- Honda-, Mazda-, and Subaru-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

68.     During the Class Period, Plaintiff Lakeland purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lakeland also purchased Automotive Constant-Velocity-Joint

Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lakeland purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Wisconsin.  Plaintiff Lakeland has also displayed, sold, serviced, and advertised its vehicles in Wisconsin during the Class Period.

69.     Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah.  Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

70.     During the Class Period, Plaintiff Salt Lake Valley purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Salt Lake Valley also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Salt Lake Valley purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Utah.  Plaintiff Salt Lake Valley has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

71.     Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon.  Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Chevrolet-, Cadillac-, and Subaru-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-

conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

72.     During the Class Period, Plaintiff Capitol Chevrolet purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Capitol Chevrolet also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Capitol Chevrolet purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Oregon.  Plaintiff Capitol Chevrolet has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

73.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon.  Plaintiff Capitol Toyota is an authorized Toyota dealer, who bought Toyota-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

74.     During the Class Period, Plaintiff Capitol Toyota purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Capitol Toyota also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Capitol Toyota purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot

Products in Oregon.  Plaintiff Capitol Toyota has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

75.     Plaintiff Beck is a South Dakota corporation, with its principal place of business in Pierre, South Dakota.  Plaintiff Beck is an authorized Chevrolet and Cadillac dealer, who bought Chevrolet- and Cadillac-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

76.     During the Class Period, Plaintiff Beck purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Beck also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Beck purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in South Dakota. Plaintiff Beck has also displayed, sold, serviced, and advertised its vehicles in South Dakota during the Class Period.

77.     Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah.  Plaintiff Wade is an authorized Toyota dealer, who bought Toyota-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

78.     During the Class Period, Plaintiff Wade purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or

their co-conspirators.  Plaintiff Wade also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Wade purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Utah.  Plaintiff Wade has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

79.     Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who bought Toyota-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

80.     During the Class Period, Plaintiff Johnson purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Johnson also purchased Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Johnson purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Mississippi. Plaintiff Johnson has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

81.     Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York.  During the Class Period, Plaintiff Hartley has been an authorized Honda, Buick, Pontiac, and GM dealer, who bought Honda-, Buick-, Pontiac-, and GM-brand

cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators.

82.     During the Class Period, Plaintiff Hartley purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Hartley also purchased Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hartley purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in New York. Plaintiff Hartley has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

83.     Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine.  Plaintiff Lee Honda is an authorized Honda dealer, who bought Honda-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

84.     During the Class Period, Plaintiff Lee Honda purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee Honda also purchased Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lee Honda purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Maine.

Plaintiff Lee Honda has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

85.     Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine.  Plaintiff Topsham is an authorized Toyota dealer, who bought Toyota-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

86.     During the Class Period, Plaintiff Topsham purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Topsham also purchased Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Topsham purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Maine. Plaintiff Topsham has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

87.     Plaintiff Hazelwood is an Arkansas corporation, with its principal place of business in Hazelwood, Missouri.  Plaintiff Hazelwood is an authorized Toyota dealer, who bought Toyota-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

88.     During the Class Period, Plaintiff Hazelwood purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or

their co-conspirators.   Plaintiff Hazelwood also purchased Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hazelwood purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Missouri.  Plaintiff Hazelwood has also displayed, sold, serviced, and advertised its vehicles in Missouri during the Class Period.

89.    Plaintiff Cannon is a Mississippi corporation, with its principal place of business in Greenwood, Mississippi.  Plaintiff Cannon is an authorized Chevrolet and Cadillac dealer, who bought Chevrolet- and Cadillac-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

90.    During the Class Period, Plaintiff Cannon purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Cannon also purchased Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Cannon purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Mississippi. Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

91.    Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi.  Plaintiff Cannon is an authorized Nissan dealer, who bought Nissan-brand cars containing Automotive Constant-Velocity-Joint Boot

Products manufactured by the Defendants or their co-conspirators, as well as Automotive
Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators
during the Class Period.

92.     During the Class Period, Plaintiff Cannon Nissan purchased vehicles containing
Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or
their co-conspirators.  Plaintiff Cannon Nissan also purchased Automotive Constant-Velocity-
Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its
repair and service business, during the Class Period.  Plaintiff Cannon purchased and received
both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in
Mississippi.  Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in
Mississippi during the Class Period.

93.     Plaintiff Hudson Nissan is a South Carolina limited liability company with its
principal place of business in North Charleston, South Carolina.  Plaintiff Hudson Nissan is an
authorized Nissan dealer, who bought Nissan-brand cars containing Automotive Constant-
Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as
Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-
conspirators during the Class Period.

94.     During the Class Period, Plaintiff Hudson Nissan purchased vehicles containing
Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or
their co-conspirators.  Plaintiff Hudson Nissan also purchased Automotive Constant-Velocity-
Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its
repair and service business, during the Class Period.  Plaintiff Hudson Nissan purchased and
received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot

Products in South Carolina.  Plaintiff Hudson Nissan has also displayed, sold, serviced, and advertised its vehicles in South Carolina during the Class Period.

95.     Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont.  Plaintiff Shearer is an authorized Honda dealer, who bought Honda-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

96.     During the Class Period, Plaintiff Shearer purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Shearer also purchased Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Shearer purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Vermont. Plaintiff Shearer has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

97.     Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont.  Plaintiff Apex is an authorized Acura dealer, who bought Acura-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

98.     During the Class Period, Plaintiff Apex purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Apex also purchased Automotive Constant-Velocity-Joint Boot

Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Apex purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Vermont.  Plaintiff Apex has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

99.     Plaintiff Gastonia Nissan is a North Carolina limited liability company with its principal place of business in Gastonia, North Carolina.  Plaintiff Gastonia Nissan is an authorized Nissan dealer that purchased Nissan-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

100.    During the Class Period Plaintiff Gastonia Nissan purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Gastonia Nissan also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Gastonia Nissan purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in North Carolina.  Plaintiff Gastonia Nissan has also displayed, sold, serviced, and advertised its vehicles in North Carolina during the Class Period.

101.    Plaintiff Bristol Toyota is a Tennessee limited liability company with its principal place of business in Bristol, Tennessee.  Plaintiff Bristol Toyota is an authorized Toyota dealer that purchased Toyota-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-

Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

102.    During the Class Period Plaintiff Bristol Toyota purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Bristol Toyota also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Bristol Toyota purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Tennessee.  Plaintiff Bristol Toyota has also displayed, sold, serviced, and advertised its vehicles in Tennessee during the Class Period.

103.    Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer that purchased Subaru-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

104.    During the Class Period Plaintiff Hodges purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Hodges also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hodges purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Michigan. Plaintiff Hodges has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

105.    Plaintiff Don Weir is a Nevada corporation with its principal place of business in Reno, Nevada.  Plaintiff Weir is an authorized Chrysler, Dodge and Jeep dealer that purchased Chrysler-, Dodge- and Jeep-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

106.    During the Class Period Plaintiff Weir purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Weir also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators. Plaintiff Weir purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in Nevada.  Plaintiff Weir has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

107.    Plaintiff John Lee is a Florida corporation with its principal place of business in Panama City, Florida.  Plaintiff John Lee is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

108.    During the Class Period Plaintiff John Lee purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff John Lee also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators. Plaintiff John Lee purchased and received both the afore-mentioned vehicles and Automotive Constant-

Velocity-Joint Boot Products in Florida.  Plaintiff John Lee has also displayed, sold, serviced, and advertised its vehicles in Florida during the Class Period.

109.    Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California.  Plaintiff Empire Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

110.    During the Class Period Plaintiff Empire Nissan purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by one or more Defendants or their co-conspirators.  Plaintiff Empire Nissan also purchased Automotive Constant-Velocity-Joint Boot Products, manufactured by one or more Defendants or their co-conspirators. Plaintiff Empire Nissan purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in California.  Plaintiff John Lee has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

111.    Plaintiff San Rafael is a California corporation with its principal place of business in San Rafael, California.  Plaintiff San Rafael is an authorized Mitsubishi dealer that purchased Mitsubishi-brand cars containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators, as well as Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-conspirators during the Class Period.

112.    During the Class Period Plaintiff San Rafael purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured by the Defendants or their co-

conspirators.  Plaintiff San Rafael also purchased Automotive Constant-Velocity-Joint Boot
Products, manufactured by the Defendants or their co-conspirators. Plaintiff San Rafael
purchased and received both the afore-mentioned vehicles and Automotive Constant-Velocity-
Joint Boot Products in California.  Plaintiff San Rafael has also displayed, sold, serviced, and
advertised its vehicles in California during the Class Period.

113.    Plaintiff Westfield is a New York company with its principal place of business in
Westfield, New York.  Plaintiff Westfield is an authorized Chrysler dealer, who sells Chrysler-,
Dodge- and Jeep-brand vehicles containing Automotive Constant-Velocity-Joint Boot Products
manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive
Constant-Velocity-Joint Boot Products manufactured by one or more of the Defendants or their
co-conspirators.

114.    During the Class Period Plaintiff Westfield purchased vehicles containing
Automotive Constant-Velocity-Joint Boot Products manufactured one or more Defendants or
their co-conspirators.  Plaintiff Westfield also purchased Automotive Constant-Velocity-Joint
Boot Products, manufactured by one or more Defendants or their co-conspirators, for its repair
and service business, during the Class Period.  Plaintiff Westfield purchased and received both
the afore-mentioned vehicles and Automotive Constant-Velocity-Joint Boot Products in New
York.  Plaintiff Westfield has also displayed, sold, serviced and advertised its vehicles in New
York during the Class Period.

**Defendants**

115.    Defendant Toyo Tire & Rubber Co., Ltd. is a Japanese company with its principal
place of business in Osaka, Japan.  Defendant Toyo Tire & Rubber Co., Ltd.– directly and/or
through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed

and/or sold Automotive Constant-Velocity-Joint Boot Products that were purchased throughout the United States, including in this District, during the Class Period.

116.     Defendant Toyo Automotive Parts (USA), Inc. is a Kentucky corporation with its principal place of business in Franklin, Kentucky.  It is a subsidiary of and wholly owned and/or controlled by its parent, Toyo Tire & Rubber Co., Ltd.  Toyo Automotive Parts (USA), Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Constant-Velocity-Joint Boot Products that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales and finances.

## AGENTS AND CO-CONSPIRATORS

117.     Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

118.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

119.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

**E.**     **The Automotive Constant-Velocity-Joint Boot Products Industry**

120.    "Automotive Constant-Velocity-Joint Boot Products" are composed of rubber or plastic, and are used to cover the constant-velocity-joints of an automobile to protect the joints from contaminants. A constant velocity universal joint boot manufactured by Defendants is shown in Figure 1 below.



121.    Automotive Constant-Velocity-Joint Boot Products are installed by component manufacturers, otherwise known as "Tier 1 Manufacturers" onto constant-velocity-joint systems. Constant-velocity-joint systems are installed by original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  Constant-velocity joint systems are also installed by OEMs in cars to replace worn out, defective or damaged constant-velocity-joint systems.

122.    Before ordering Automotive Constant-Velocity-Joint Boot Products, Tier 1 Manufacturers typically enter into Long Term Agreements ("LTAs") with and/or issue requests for quotation ("RFQs") to their suppliers.  In response to the RFQs, the suppliers submit price quotes, or bids, to the Tier 1 Manufacturers.

123.    The Defendants and their co-conspirators supplied Automotive Constant-Velocity-Joint Boot Products to Tier 1 Manufacturers, who incorporated the Automotive

Constant-Velocity-Joint Boot Products into constant-velocity-joint systems.  The Tier1

Manufacturers then supplied constant-velocity-joint systems to OEMs for installation in vehicles

manufactured and sold in the United States and elsewhere.  Defendants and their co-conspirators

supplied Automotive Constant-Velocity-Joint Boot Products to Tier 1 Manufacturers for

installation in vehicles manufactured and sold in the United States and elsewhere.

124.    One such Tier 1 to whom Defendants sold Constant-Velocity-Joint Boot Products

during the Class Period, is GKN PLLC.

125.    GKN PLLC's main customers include Volvo, Volkswagen, Renault-Nissan, Fiat

Chrysler, GM, Ford, Toyota, Mitsubishi, BMW and Tata.

126.    Plaintiffs and members of the proposed Classes purchased Automotive Constant-

Velocity-Joint Boot Products indirectly from the Defendants.  By way of example, a dealership

may indirectly purchase one or more Automotive Constant-Velocity-Joint Boot Product(s) from

the Defendants as part of purchasing a new vehicle.   A dealership may also indirectly purchase

for replacement one or more Automotive Constant-Velocity-Joint Boot Product(s) from the

Defendants when repairing a damaged vehicle or where one or more of the vehicle's Automotive

Constant-Velocity-Joint Boot Product(s) are defective.

127.    Replacement Automotive Constant-Velocity-Joint Boot Products sold to

dealerships through OEMs are the same as the Automotive Constant-Velocity-Joint Boot

Products installed in vehicles and are made by the same manufacturer who made the Automotive

Constant-Velocity-Joint Boot Products originally installed—that is the purpose of an OEM part,

made by the OEM supplier.  Such replacement parts are not the same as aftermarket parts, which

are made by different manufacturers than those who manufactured the original parts.  The prices

of replacement Automotive Constant-Velocity-Joint Boot Products were inflated by Defendants'
collusion.

> **F.     The Structure and Characteristics of the Automotive Constant-Velocity-Joint Boot Products Market Render the Conspiracy More Plausible**

128.    The structure and other characteristics of the Automotive Constant-Velocity-Joint
Boot Products market in the United States are conducive to a price-fixing agreement, and have
made collusion particularly attractive in this market.  Specifically, the Automotive Constant-
Velocity-Joint Boot Products market: (1) has high barriers to entry; and (2) has inelasticity of
demand.

> **1.     The Automotive Constant-Velocity-Joint Boot Products Market Has High Barriers to Entry**

129.    A collusive arrangement that raises product prices above competitive levels
would, under basic economic principles, attract new entrants seeking to benefit from the supra-
competitive pricing.  Where, however, there are significant barriers to entry, new entrants are
less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

130.    There are substantial barriers that preclude, reduce, or make more difficult entry
into the Automotive Constant-Velocity-Joint Boot Products market.  A new entrant into the
business would face costly and lengthy start-up costs, including multi-million dollar costs
associated with manufacturing plants and equipment, energy, transportation, distribution
infrastructure, and long-standing customer relationships.

131.    Likewise, any competitor needs advanced engineering and technological prowess
in order to design a competitive Automotive Constant-Velocity-Joint Boot Product.

132.    The Defendants own several patents related to the manufacture of Automotive
Constant-Velocity-Joint Boot Products.  These patents place a significant and costly burden on

potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

133.    In addition, customers cannot change Automotive Constant-Velocity-Joint Boot Products suppliers randomly after a supplier is initially selected because the OEMs design the features of their vehicles so that the Automotive Constant-Velocity-Joint Boot Products are then integrated with the other components the vehicle. Thus, the design must be synergized. It would be difficult for a new market entrant to do so.

### 2.    There is Inelasticity of Demand for Automotive Constant-Velocity-Joint Boot Products

134.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

135.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

136.    Demand for Automotive Constant-Velocity-Joint Boot Products is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase Automotive Constant-Velocity-Joint Boot Products as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### G.    Government Investigations

137.    A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of automotive parts.  A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that automotive parts supplier investigations by the JFTC, DOJ and EC would continue to widen because the automotive industry as a whole comprises many sub-industries.  He characterized the investigations being conducted by the U.S., European and Japanese antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

138.    The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC").  The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

139.    On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers.

140.    The DOJ Antitrust Division's broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry is the largest criminal investigation the Antitrust Division has ever pursued.  The ongoing cartel investigation of price-fixing and bid-rigging in the automobile parts industry has yielded more than $2.4 billion in criminal fines.

141.    On November 26, 2013, the DOJ announced that Defendant Toyo Tire & Rubber Co., Ltd. agreed to plead guilty and pay a $120 million criminal fine for its role in a conspiracy to fix prices of Automotive Constant-Velocity-Joint Boot Products, and another automotive part, installed in automobiles sold in the United States and elsewhere.  Toyo and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition

by agreeing to allocate sales of, and to fix, raise, and maintain the prices of Automotive

Constant-Velocity-Joint Boot Products sold in the United States and elsewhere from at least as

early as January 2006 and continuing until as late as September 2010 in violation of the Sherman

Act, 15 U.S.C. § 1.

142.   According to the Information filed, Defendant Toyo and its co-conspirators

carried out the Automotive Constant-Velocity-Joint Boot Products conspiracy by:

(a)   participating in meetings and engaging in discussions concerning prices

for Automotive Constant-Velocity-Joint Boot Products sold to GKN plc and its subsidiaries

(collectively, "GKN") in the United States and elsewhere;

(b)   agreeing during those meetings and discussions to allocate among the

companies certain sales of certain Automotive Constant-Velocity-Joint Boot Products sold to

GKN in the United States and  elsewhere;

(c)   agreeing, during those meetings, conversations, and communications, on

prices to be submitted to GKN in the United States and elsewhere;

(d)   discussing and exchanging prices for certain Automotive Constant-

Velocity-Joint Boot Products sold to GKN in the United States and elsewhere;

(e)   submitting bids and price quotations to GKN in the United States and

elsewhere in accordance with the agreements;

(f)   selling Automotive Constant-Velocity-Joint Boot Products[2] to GKN in the

United States and elsewhere at collusive and noncompetitive prices; and

(g)   accepting payment for Automotive Constant-Velocity Joint Boot

Products[3] sold to GKN in the United States and elsewhere at collusive and noncompetitive

prices.

---

[2] The Information refers to automotive anti-vibration rubber products instead of automotive constant-velocity-joint boot products however this appears to be a typo.

[3] The Information refers to automotive anti-vibration rubber products instead of automotive constant-velocity-joint boot products however this appears to be a typo.

**D.      Guilty Pleas and Other Criminal Pleadings Arising From the Automotive Parts Investigation**

143.    On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. had agreed to plead guilty and to pay a $200 million criminal fine for its role in a criminal price-fixing and bid rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

144.    Three of Furukawa's executives also pleaded guilty to the same conspiracy.  The court sentenced two of the executives to 15 and 18 month prison sentences, to be served in the United States.

145.    In the press release announcing the fine against Furukawa Electric Co. Ltd., Sharis A Pozen, then the Acting Assistant Attorney General in charge of the DOJ's Antitrust division, said that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers."  Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."  The press release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust crimes."

146.    On January 30, 2012, the DOJ announced that Yazaki Corporation ("Yazaki") and DENSO Corporation ("DENSO") had agreed to plead guilty and to pay a total of $548 million in criminal fines for their involvement in multiple price-fixing and bid-rigging conspiracies in the sale of automotive parts to automotive manufacturers in the United States.  According to the

three-count felony charge against Yazaki, it engaged in the following three conspiracies: (1)
participating in a combination and conspiracy with its co-conspirators to suppress and eliminate
competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and
maintain the prices of, automotive wire harnesses and related products sold to automobile
manufacturers in the United States and elsewhere from at least as early as January 2000 and
continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; (2)
participating in a combination and conspiracy to suppress and eliminate competition in the
automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices
of, instrument panel clusters sold to automobile manufacturers in the United States and
elsewhere, from at least as early as December 2002 until at least February 2010, in violation of
the Sherman Antitrust Act, 15 U.S.C. § 1; and (3) participating in a combination and conspiracy
with its co-conspirators to suppress and eliminate competition in the automotive parts industry
by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of fuel senders sold to
automobile manufacturers in the United States and elsewhere from at least as early as March
2004 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

147.    According to the two-count felony charge against DENSO, it engaged in
conspiracies to rig bids for and to fix, stabilize, and maintain the prices of electric control units
and heater control panels.

148.    In addition to Yazaki, five executives from Yazaki (all Japanese nationals) –
Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa, Kazuhiko Kashimoto and Hisamitsu Takada
– pleaded guilty to their participation in a conspiracy to suppress and eliminate competition in
the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the
prices of automotive wire harnesses sold to automobile manufacturers in the United States and

elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  These five Yazaki executives will each pay a $20,000 criminal fine and serve prison time ranging from 15 months to two years. The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

149.    On March 26, 2012, the DOJ announced that Norihiro Imai, and executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of heater control panels sold to customers in the United States.

150.    On April 26, 2012, the DOJ announced that Makoto Hattori, another executive of Defendant DENSO Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of heater control panels sold to a customer in the United States and elsewhere.

151.    On May 21, 2013, the DOJ announced that Yuji Suzuki, yet another executive of Defendant DENSO Corporation, agreed to serve sixteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a two-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of electronic control units and heater control panels sold in the United States and elsewhere.

152.    In the press release announcing the fines against Yazaki and DENSO, FBI Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been

occurring for at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

153.    "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said.  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

154.    A number of additional companies have pleaded guilty to fixing the prices of automotive parts, including, among others:  automotive wire harnesses;  instrument panel clusters; fuel senders; heater control panels; occupant safety restraint systems; automotive bearings; windshield wipers; starters; radiators; alternators; ignition coils; anti-vibration rubber parts, automatic transmission fluid warmers; switches; steering angle sensors; HID ballasts; and automotive lamps.  These companies include, among others:  Fujikura Ltd.; GS Electech, Inc.; TRW Deutschland Holding GmbH; Autoliv, Inc.; Nippon Seiki Co., Ltd.; JTEKT Corporation; Mitsuba Corporation; Mitsubishi Electric Corporation; Mitsubishi Heavy Industries, Ltd.; NSK Ltd.; Panasonic Corporation; T. RAD Co., Ltd.; Tokai Rika Co.; Valeo Japan Co., Ltd.; Yamashita Rubber Co., Ltd.; and Bridgestone Corporation.  The majority of these violators pleaded guilty to engaging in bid-rigging, price-fixing, and market allocation during the same time period as the Defendants with multiple OEMs as their targets, including, among others, Suzuki, Honda, Mazda, Mitsubishi, Subaru, Chrysler, German manufacturers and unnamed automobile manufacturers.

155.    On April 3, 2012, the DOJ announced that G.S. Electech, Inc. had agreed to plead guilty and to pay a $2.75 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, speed sensor wire assemblies used on antilock brake systems sold to an automobile manufacturer in the United States and elsewhere.

156.    On April 23, 2012, the DOJ announced that Fujikura Ltd. had agreed to plead guilty and to pay a $20 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere.

157.    On June 6, 2012 , the DOJ announced that Autoliv Inc. had agreed to plead guilty to a two-count criminal Information and to pay a $14.5 criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by (i) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts sold to a Japanese automobile manufacturer; and (ii) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts, airbags, and/or steering wheels sold to a Japanese automobile manufacturer.

158.    On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH had agreed to plead guilty and to pay a $5.1 million criminal fine for its involvement in a combination and conspiracy, through its employees, including high level employees of its wholly-owned subsidiaries, to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts, airbags and steering wheels sold to two German automobile manufacturers in the United States and elsewhere.

159.    On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. had agreed to plead guilty and to pay a $1 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to an automobile manufacturer in the United States and elsewhere.

160.    On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. agreed to plead guilty and to pay a $17.7 million criminal fine for its involvement in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs sold to Toyota Motor Corporation and Toyota Motor Engineering & Manufacturing North America, Inc. in the United States and elsewhere.  Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

161.    On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered*.  I say the biggest with respect to the impact on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigation*."  (emphasis added).

162.    On July 10, 2013, the European Commission fined four wire harness suppliers, Yazaki, S-Y Systems, Furukawa Electric and Leoni, a total of $182 million for taking part in cartels that affected Toyota, Nissan, Honda and Renault.

163.    On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. had agreed to plead guilty and to pay a $19 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, ignition coils sold to automobile manufacturers in the United States and elsewhere.

164.    On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of various automotive parts

including high intensity discharge (HID) ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

165.    On September 11, 2013, two Fujikura, Ltd. executives were indicted for conspiring to fix the price of wire harness assemblies to Fuji Heavy Industries, the maker of Subaru automobiles.

166.    On September 26, 2013, nine additional Japanese automotive suppliers and two more executives agreed to plead guilty to conspiracy charges and pay more than $740 million in fines for their roles in rigging the prices of 30 products.

167.    The diagram below, which was prepared by the DOJ, illustrates the guilty pleas announced September 26, 2013, and the corresponding automotive parts to which the various manufacturers admitted to price-fixing.



168. On October 9, 2013, Takata Corporation announced that it had agreed to pay $71.3 million to settle antitrust charges brought by the United States federal prosecutors for its part in a conspiracy to price-fix seatbelts.

169. On November 26, 2013, the DOJ announced that Defendant Toyo Tire & Rubber Co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies to fix the prices of automotive components involving anti-vibration rubber and Constant-Velocity-Joint Boots installed in automobiles sold in the United States and elsewhere.

170.    On November 27, 2013, Stanley Electric Co. Ltd. agreed to pay a $1.44 million criminal fine and plead guilty to price-fixing allegations involving high-intensity discharge (HID) lamp ballasts sold to automakers in the United States and elsewhere.

171.    On January 16, 2014, Koito Manufacturing Co. Ltd. agreed to pay a $56.6 million criminal fine and plead guilty for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and automotive high-intensity discharge (HID) lamp ballasts installed in cars sold in the United States and elsewhere.

172.    On February 3, 2014, Aisan Industry Co. Ltd. agreed to pay a $6.86 million criminal fine and plead guilty for its part in a price-fixing conspiracy involving electronic throttle bodies.

173.    On February 13, 2014, Bridgestone Corp. agreed to pay a $425 million criminal fine and plead guilty for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts.

174.    On February 20, 2014, the DOJ announced that Kazuaki Fujutani, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison and plead guilty to a one-count criminal Information charging him with obstruction of justice for deleting numerous e-mails and electronic documents upon learning the FBI was executing a search warrant on Defendant DENSO International America, Inc., in connection with the DOJ's investigation into a conspiracy to fix the prices of heater control panels installed in automobiles sold in the United States and elsewhere.

175.    On April 23, 2014, Showa Corp. agreed to pay a $19.9 million criminal fine and plead guilty for its role in a conspiracy to fix prices of pinion-assist type electric powered steering assemblies.

176.    On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. agreed to plead guilty and to pay a $52.1 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in cars sold to automobile manufacturers in the United States and elsewhere.

177.    On September 29, 2014, the DOJ announced that Toyoda Gosei Co. Ltd. agreed to plead guilty and to pay a $26 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to Toyota in the United States and by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels sold to Subaru and Toyota in the United States and elsewhere.

178.    On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. agreed to plead guilty and to pay a $1.25 million criminal fine for its role in a conspiracy to allocate the sales of, to rig bids for, and to fix, raise, and maintain the prices of automotive brake hose sold to Toyota in the United States and elsewhere.

179.    On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

180. On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty and to pay a criminal fine of $4 million for their roles in a conspiracy to rig bids of instrument panel clusters installed in vehicles manufactured and sold in the United States.

181.     To date, thirty-two companies and forty-eight executives have been charged in the Antitrust Division's ongoing investigation into price fixing and bid rigging in the auto parts industry.  Each of the thirty-two companies have either pleaded guilty or have agreed to plead guilty and have agreed to pay approximately $2.4 billion in criminal fines.

182.     The U.S. government has said its automotive parts cartel criminal investigation will continue and other suppliers could be charged.

**E.     Likely Existence of an "Amnesty Applicant."**

183.     The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant."  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

184.     In light of the guilty plea in this case, guilty pleas in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

**F.     Damage to Plaintiffs and Other Automobile Dealers Caused by Defendants' Illegal Activities**

185.     Defendants' conspiracy resulted in Defendants charging inflated prices to firms who directly purchased Automotive Constant-Velocity-Joint Boot Products from them and in those purchasers raising their prices to subsequent purchasers.

186.     Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Automotive Constant-Velocity-Joint Boot Products they sold to Plaintiffs and

the Classes, firms who sold such Automotive Constant-Velocity-Joint Boot Products and vehicles passed Defendants' overcharges on to Plaintiffs and the Classes.

187.    Plaintiffs and the Classes are entitled to the overcharges they paid for Automotive Constant-Velocity-Joint Boot Products.

188.    Plaintiffs have standing and have suffered damage compensable by indirect purchaser laws and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy.

## CLASS ACTION ALLEGATIONS

189.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that, during the Class Period, (a) indirectly purchased Automotive Constant-Velocity-Joint Boot Products manufactured or sold by a Defendant or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured or sold by a Defendant or any current or former subsidiary, affiliate thereof or co-conspirator.

190.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, as well as the unjust enrichment laws of Missouri, Massachusetts and Illinois.  The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, and Illinois, are collectively referred to as the "Indirect Purchaser States."  These claims are brought by Plaintiffs on behalf of themselves and entities in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows (the "Damages Class"):

All automobile dealers, in the Indirect Purchaser States, that, during the Class Period (a) indirectly purchased Automotive Constant-Velocity-Joint Boot Products manufactured or sold by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or (b) purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products manufactured or sold by one of the Defendants or any current or former subsidiary, affiliate or co-conspirator thereof.

191.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."  Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, any judicial officer presiding over this matter, persons who purchased Automotive Constant-Velocity-Joint Boot Products directly, and persons in the End-Payor Class, as defined in the End-Payor complaint.

192.     While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

193.     Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of the Defendants' and their co-conspirators' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Automotive Constant-Velocity-Joint Boot Products sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by the Defendants and their co-conspirators in furtherance of the conspiracy;

    (d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

    (e)     Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

    (f)     Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by the Defendants, as alleged in the Fourth Claim for Relief;

    (g)     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

    (h)     The effect of the alleged conspiracy on the prices of Automotive Constant-Velocity-Joint Boot Products sold in the United States during the Class Period;

    (i)     Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

    (j)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

    (k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

    (l)     The appropriate class-wide measure of damages for the Damages Class.

194.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products purchased indirectly from the Defendants and/or their co-conspirators.

195.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not

antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel

who are competent and experienced in the prosecution of antitrust and class action litigation.

196.     The questions of law and fact common to the members of the Classes

predominate over any questions affecting only individual members, including legal and factual

issues relating to liability and damages.

197.     Class action treatment is a superior method for the fair and efficient adjudication

of the controversy, in that, among other things, such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently and without the unnecessary duplication of evidence, effort and expense that

numerous individual actions would engender.  The benefits of proceeding through the class

mechanism, including providing injured persons or entities with a method for obtaining redress

for claims that might not be practicable to pursue individually, substantially outweigh any

difficulties that may arise in the management of this class action.

198.     The prosecution of separate actions by individual members of the Classes would

create a risk of inconsistent or varying adjudications, establishing incompatible standards of

conduct for the Defendants.

### PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

199.     The Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to
Automotive Constant-Velocity-Joint Boot Products;

(b)     The prices of Automotive Constant-Velocity-Joint Boot Products have
been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Indirect purchasers of Automotive Constant-Velocity-Joint Boot Products
have been deprived of free and open competition;

(d)     Defendants charged direct purchasers of their Automotive Constant-
Velocity-Joint Boot Products inflated prices as a result of their conspiracy;

(e)    Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Automotive Constant-Velocity-Joint Boot Products they sold to Plaintiffs and the Classes, firms who sold Defendants' Automotive Constant-Velocity-Joint Boot Products and vehicles to Plaintiffs and the Classes passed Defendants' overcharges on to them;

(f)    Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Classes;

(g)    Automobile dealers purchasing Automotive Constant-Velocity-Joint Boot Products and vehicles containing Automotive Constant-Velocity-Joint Boot Products have been deprived of free and open competition; and

(h)    Indirect purchasers of Automotive Constant-Velocity-Joint Boot Products paid artificially inflated prices.

200.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Automotive Constant-Velocity-Joint Boot Products, as a result of the Defendants' conspiracy.

201.    An increase in the prices of Automotive Constant-Velocity-Joint Boot Products caused an increase in the price of vehicles during the class period.

202.    Automotive Constant-Velocity-Joint Boot Products comprise a significant portion of the price of a vehicle.

203.    The markets for Automotive Constant-Velocity-Joint Boot Products and vehicles are inextricably linked and intertwined because the market for Automotive Constant-Velocity-Joint Boot Products exists to serve the vehicle market.  Without the vehicles, the Automotive Constant-Velocity-Joint Boot Products have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for Automotive Constant-Velocity-Joint Boot Products.  As stated in the 2010 Annual Report of Lear Corporation, an automobile parts supplier:  "Our sales are driven by the number of vehicles produced by the automotive

manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

204.    Automotive Constant-Velocity-Joint Boot Products are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Automotive Constant-Velocity-Joint Boot Products follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Constant-Velocity-Joint Boot Products can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

205.    Just as Automotive Constant-Velocity-Joint Boot Products can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Automotive Constant-Velocity-Joint Boot Products affect prices paid by indirect purchasers of new motor vehicles containing Automotive Constant-Velocity-Joint Boot Products and Automotive Constant-Velocity-Joint Boot Products purchased for repair purposes.

206.    Automotive Constant-Velocity-Joint Boot Products have their own part numbers, which permit them to be tracked.

207.    Automotive Constant-Velocity-Joint Boot Products can be removed from a finished vehicle and replaced.

208.    The Automotive Constant-Velocity-Joint Boot Products subject to the Defendants' conspiracy and at issue in this lawsuit only have one use: to be inserted into vehicles. Whether Automotive Constant-Velocity-Joint Boot Products are sold by themselves or in vehicles, their purpose is to be inserted into vehicles.

209.     The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of Automotive Constant-Velocity-Joint Boot Products and, as a direct and foreseeable result, the price of new motor vehicles containing Automotive Constant-Velocity-Joint Boot Products and the price of Automotive Constant-Velocity-Joint Boot Products purchased for repair purposes.  Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.  Thus, an economist can isolate and identify only the impact of an increase in the price of Automotive Constant-Velocity-Joint Boot Products on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time.  A regression model can explain how variation in the price of Automotive Constant-Velocity-Joint Boot Products affects changes in the price of new motor vehicles.  In such models, the price of Automotive Constant-Velocity-Joint Boot Products would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of Automotive Constant-Velocity-Joint Boot Products impact the price of new motor vehicles containing Automotive Constant-Velocity-Joint Boot Products while controlling for the impact of other price-determining factors.

210.     The precise amount of the overcharge impacting the prices of new motor vehicles containing Automotive Constant-Velocity-Joint Boot Products can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and

the amount of the supracompetitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and class members can be quantified.

211.    By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Constant-Velocity-Joint Boot Products than they would have paid in the absence of the Defendants' and their co-conspirators' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent, and Plaintiffs' and Class members' damages are measurable.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims

212.    Plaintiffs repeat and re-allege the allegations set forth above.

213.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) November 26, 2013, the date that the DOJ publicly announced Defendant Toyo Tire & Rubber Co., Ltd.'s anticipated guilty plea.

214.    Plaintiffs and the members of the Classes are indirect purchasers who purchased automobiles or purchased Automotive Constant-Velocity-Joint Boot Products to replace or repair damaged or defective Automotive Constant-Velocity-Joint Boot Products in their automobiles. They had no direct contact or interaction with the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before November 26, 2013, the date that the DOJ publicly announced Defendant Toyo Tire & Rubber Co., Ltd.'s anticipated guilty plea.

215.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to November 26, 2013, the date that the DOJ publicly announced Defendant Toyo Tire & Rubber Co., Ltd.'s anticipated guilty plea, that revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to price-fix and rig bids for Automotive Constant-Velocity-Joint Boot Products.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of the Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

216.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

**B.    Fraudulent Concealment Tolled the Statute of Limitations**

217.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November 26, 2013, the date that the DOJ publicly announced Defendant Toyo Tire & Rubber Co., Ltd.'s anticipated guilty plea.

218.    Because the Defendants' agreements, understandings, and conspiracies were kept secret until November 26, 2013, Plaintiffs and members of the Classes were unaware before that time of the Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices for Automotive Constant-Velocity-Joint Boot Products throughout the United States during the Class Period. No information, actual or constructive, was

ever made available to Plaintiffs and the members of the Classes that indicated to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

219.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

220.    Defendants had secret communications to collusively fix prices, rig bids, and allocate markets for Automotive Constant-Velocity-Joint Boot Products.

221.    Defendants also concealed their conspiracy by submitting bids to customers, to give the appearance of competition, despite having already determined among themselves who would win each bid.

222.    By its very nature, the Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing. Automotive Constant-Velocity-Joint Boot Products are not exempt from antitrust regulation, and thus, before November 26, 2013, Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' Automotive Constant-Velocity-Joint Boot Products prices before November 26, 2013.

223.    Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

224.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by the Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until November 26, 2013, the date that the DOJ publicly announced Defendant Toyo Tire & Rubber Co., Ltd.'s anticipated guilty plea.

225.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until November 26, 2013.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

226.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

227.    The Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

228.    The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

229.    At least as early as January 2006, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, the Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Constant-Velocity-Joint Boot Products, thereby creating anticompetitive effects.

230.    The anticompetitive acts were intentionally directed at the United States market for Automotive Constant-Velocity-Joint Boot Products and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Constant-Velocity-Joint Boot Products throughout the United States.

231.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Constant-Velocity-Joint Boot Products.

232.    As a result of the Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Constant-Velocity-Joint Boot Products have been harmed by being forced to pay inflated, supracompetitive prices for Automotive Constant-Velocity-Joint Boot Products.

233.    In formulating and carrying out the alleged agreement, understanding and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

234.    The Defendants' and their co-conspirators' conspiracy had the following effects, among others:

(a)    Price competition in the market for Automotive Constant-Velocity-Joint Boot Products has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Automotive Constant-Velocity-Joint Boot Products sold by the Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Nationwide Class who purchased Automotive Constant-Velocity-Joint Boot Products indirectly from the Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

235.   Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Constant-Velocity-Joint Boot Products purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

236.   Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Automotive Constant-Velocity-Joint Boot Products and vehicles.

237.   Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Automotive Constant-Velocity-Joint Boot Products and vehicles containing Automotive Constant-Velocity-Joint Boot Products because they are required to purchase vehicles and Automotive Constant-Velocity-Joint Boot Products to continue to operate their businesses.

238.   Plaintiffs and members of the Nationwide Class continue to purchase vehicles and Automotive Constant-Velocity-Joint Boot Products, on a regular basis.

239.   Vehicles and Automotive Constant-Velocity-Joint Boot Products continue to be sold at inflated and supracompetitive prices.

240.   Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

241.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

242.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against the Defendants, preventing and restraining the violations alleged herein.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

243.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

244.    From as early as January 2006 until at least the filing of this Complaint, the Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Constant-Velocity-Joint Boot Products in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

245.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive levels the prices for Automotive Constant-Velocity-Joint Boot Products and to allocate customers for Automotive Constant-Velocity-Joint Boot Products in the United States.

246.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Automotive Constant-Velocity-Joint Boot Products at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Automotive Constant-Velocity-Joint Boot Products sold in the United States;

(b)　allocating customers and markets for Automotive Constant-Velocity-Joint Boot Products in the United States in furtherance of their agreements; and

(c)　participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

247.　The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Automotive Constant-Velocity-Joint Boot Products.

248.　The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

249.　The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)　The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)　During the Class Period, the Defendants' illegal conduct substantially affected Arizona commerce.

(c)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, the Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

250.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)      During the Class Period, the Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. The Defendants have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Automotive Constant-Velocity-Joint Boot Products at supracompetitive levels.

(b)      The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Automotive Constant-Velocity-Joint Boot Products.

(c)      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above

and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Automotive

Constant-Velocity-Joint Boot Products; and (2) Allocating among themselves the production of

Automotive Constant-Velocity-Joint Boot Products.

(d)     The combination and conspiracy alleged herein has had, inter alia, the

following effects:  (1) Price competition in the sale of Automotive Constant-Velocity-Joint Boot

Products has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices

for Automotive Constant-Velocity-Joint Boot Products sold by the Defendants and their co-

conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive

levels in the State of California and throughout the United States; and (3) Those who purchased

Automotive Constant-Velocity-Joint Boot Products directly or indirectly from the Defendants

and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of the Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property in

that they paid more for Automotive Constant-Velocity-Joint Boot Products than they otherwise

would have paid in the absence of the Defendants' unlawful conduct.  As a result of the

Defendants' violation of Section 16720 of the California Business and Professions Code,

Plaintiffs and members of the Damages Class seek treble damages and their cost of suit,

including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business

and Professions Code.

251.   The Defendants have entered into an unlawful agreement in restraint of trade in

violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies

had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price

competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in the District of Columbia were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in the District of Columbia paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products, including in the District of Columbia.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

252.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Constant-Velocity-Joint Boot Product price

competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Automotive

Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class

paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot

Products and vehicles containing Automotive Constant-Velocity-Joint Boot Products.

(b)      During the Class Period, the Defendants' illegal conduct substantially

affected Hawaii commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

253.    By reason of the foregoing, the Defendants have entered into agreements in

restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available

under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

254.    The Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

(a)      The Defendants' and their co-conspirators' combinations or conspiracies

had the following effects: (1) Automotive Constant-Velocity-Joint Boot Product price

competition was restrained, suppressed, and eliminated throughout Illinois; (2) Automotive

Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class

paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products and vehicles containing Automotive Constant-Velocity-Joint Boot Products.

(b)      During the Class Period, the Defendants' illegal conduct substantially affected Illinois commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*[4]

255.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq*.

(a)      The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

---

[4] Dealership Plaintiffs recognize that their claims under the Illinois Antitrust Act were dismissed in the *Wire Harness* action.  Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

256.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

257.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Maine; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

258.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Michigan commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

259.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

(a)    The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)    During the Class Period, the Defendants' illegal conduct substantially affected Minnesota commerce.

(c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

260.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

(a)    The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price

competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Automotive

Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at

artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class,

including those who resided in Mississippi and/or purchased Automotive Constant-Velocity-

Joint Boot Products or vehicles in Mississippi were deprived of free and open competition,

including in Mississippi; and (4) Plaintiffs and members of the Damages Class, including those

who resided in Mississippi and/or purchased Automotive Constant-Velocity-Joint Boot Products

or vehicles in Mississippi paid supracompetitive, artificially inflated prices for Automotive

Constant-Velocity-Joint Boot Products, including in Mississippi.

(b)     During the Class Period, the Defendants' illegal conduct substantially

affected Mississippi commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements

in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code

Ann. §§ 75-21-1, *et seq.*

261.    The Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies

had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price

competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Automotive

Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

       (b)     During the Class Period, the Defendants' illegal conduct substantially affected Nebraska commerce.

       (c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

       (d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

262.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

       (a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in Nevada, were deprived of free and open competition, including in

Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in Nevada paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products, including in Nevada.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

263.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

264.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

265.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in New York, paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products when they purchased, including in New York, vehicles containing Automotive Constant-Velocity-Joint Boot Products, or purchased products that were otherwise of lower quality than they would have been absent the Defendants' and their co-conspirators'

illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.  The conduct set forth above is a *per se* violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

266.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in North Carolina, paid supracompetitive, artificially

inflated prices for Automotive Constant-Velocity-Joint Boot Products, including in North Carolina.

(b)    During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce.

(c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

267.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)    The Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)    During the Class Period, the Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

268.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

269.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in South Dakota, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in South Dakota paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products, including in South Dakota.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

270.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in Tennessee, were deprived of free and open competition, including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in Tennessee paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products, including in Tennessee.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

271.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq*.

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Utah; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

272.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2453, *et seq.*

(a)    The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)    During the Class Period, the Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2453, *et seq.* Plaintiffs are entitled to relief pursuant to 9 Vermont Ann. Stat. § 2465 and any other applicable authority.

273.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)     The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in West Virginia, were deprived of free and open competition, including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in West Virginia paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products, including in West Virginia.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

274.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*.

(a)    The Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(b)    During the Class Period, the Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

275.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of the Defendants' and their co-conspirators' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for Automotive Constant-Velocity-Joint Boot Products than they otherwise would have paid in the absence of the Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

276.     In addition, the Defendants have profited significantly from the aforesaid conspiracy.  The Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

277.     Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

278.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

279.     The Defendants knowingly engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

280.     The Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

(a)     The Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Constant-Velocity-Joint Boot Products were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)      The Defendants' unlawful conduct had the following effects: (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products and vehicles containing Automotive Constant-Velocity-Joint Boot Products.

(d)      During the Class Period, the Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)      As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

281.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

282.    The Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)      During the Class Period, the Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from the Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)     The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of the Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

(d)     The Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq*., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)     The Defendants' acts or practices are unfair to purchasers of Automotive Constant-Velocity-Joint Boot Products (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(f)     Defendants unlawful conduct had the following effects: (1) Automotive Constant-Velocity-Joint Boot Products price competition was restrained, suppressed, and eliminated throughout California; (2) Automotive Constant-Velocity-Joint Boot Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3)

Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in California, paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products and vehicles containing Automotive Constant-Velocity-Joint Boot Products, including in California.

(g)     The Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(h)     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the Defendants as a result of such business acts or practices.

(i)     The illegal conduct alleged herein is continuing and there is no indication that the Defendants will not continue such activity into the future.

(j)     The unlawful and unfair business practices of the Defendants have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Automotive Constant-Velocity-Joint Boot Products (or vehicles containing them).  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)     The conduct of the Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(l)     As alleged in this Complaint, the Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by the Defendants' unfair

competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to

equitable relief including restitution and/or disgorgement of all revenues, earnings, profits,

compensation, and benefits that may have been obtained by the Defendants as a result of such

business practices, pursuant to the California Business and Professions Code, Sections 17203 and

17204.

283.    The Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act,

Fla. Stat. §§ 501.201, *et seq*.

(a)     The Defendants' unlawful conduct had the following effects:  (1)

Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed,

and eliminated throughout Florida; (2) Automotive Constant-Velocity-Joint Boot Product prices

were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3)

Plaintiffs and members of the Damages Class, including those who resided in Florida and/or

purchased Automotive Constant-Velocity-Joint Boot Product or vehicles in Florida were

deprived of free and open competition, including in Florida; and (4) Plaintiffs and members of

the Damages Class, including those who resided in Florida and/or purchased Automotive

Constant-Velocity-Joint Boot Product or vehicles in Florida, paid supracompetitive, artificially

inflated prices for Automotive Constant-Velocity-Joint Boot Products, including in Florida.

(b)     During the Class Period, the Defendants' illegal conduct substantially

affected Florida commerce and consumers.

(c)     As a direct and proximate result of the Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured and are threatened with further

injury.

(d)     The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

284.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)     The Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Constant-Velocity-Joint Boot Products were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

285.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Automotive Constant-Velocity-Joint Boot Products.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Automotive Constant-Velocity-Joint Boot Products because they were unaware of the unlawful overcharge and because they had to purchase Automotive Constant-Velocity-Joint Boot Products in order to be able to operate their vehicles.  Defendants' conduct with regard to sales of Automotive Constant-Velocity-Joint Boot Products, including their illegal conspiracy to secretly fix the price of Automotive Constant-Velocity-Joint Boot Products at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.

(a)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Automotive Constant-Velocity-Joint Boot Products as set forth in N.M.S.A., § 57-12-2E due to the inflated prices paid by Plaintiffs and Class members for vehicles and Automotive Constant-Velocity-Joint Boot Products.

(b)     The Defendants' unlawful conduct had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(c)     During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(d)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(e)     The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

286.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     The Defendants and their co-conspirators agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Constant-Velocity-Joint Boot Products were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Automotive Constant-Velocity-Joint Boot Products they had purchased as replacements and inside vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     The Defendants' unlawful conduct had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in New York paid

supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products, including in New York.

(e)     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Automotive Constant-Velocity-Joint Boot Products were misled to believe that they were paying a fair price for Automotive Constant-Velocity-Joint Boot Products or the price increases for Automotive Constant-Velocity-Joint Boot Products were for valid business reasons; and similarly situated purchasers were affected by Defendants' conspiracy.

(f)     During the Class Period, the Defendants' illegal conduct substantially affected New York commerce and New York purchasers.

(g)     During the Class Period, the Defendants directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Constant-Velocity-Joint Boot Products in New York.

(h)     Defendants knew that their unlawful trade practices with respect to pricing Automotive Constant-Velocity-Joint Boot Products would have a broad impact, causing class members who indirectly purchased Automotive Constant-Velocity-Joint Boot Products to be injured by paying more for Automotive Constant-Velocity-Joint Boot Products than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(i)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

287.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)      The Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Constant-Velocity-Joint Boot Products were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injury to purchasers and broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)      The Defendants' unlawful conduct had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Automotive Constant-Velocity-Joint Boot Products or vehicles in North Carolina paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products, including in North Carolina.

(d)      During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers in North Carolina.

(e)    Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

(f)    During the Class Period, the Defendants directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Constant-Velocity-Joint Boot Products in North Carolina.

(g)    Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

288.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)    The Defendants' combinations or conspiracies had the following effects: (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products and vehicles containing Automotive Constant-Velocity-Joint Boot Products.

(b)    During the Class Period, the Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

289.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.,* and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

290.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)     The Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Constant-Velocity-Joint Boot Products were sold, distributed, or obtained in Vermont.

(b)     The Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.  The Defendants owed a duty to disclose such facts the Defendants breached that duty by their silence.  The Defendants misrepresented to all purchasers during the Class Period that their Automotive Constant-Velocity-Joint Boot Product prices were competitive and fair.

(c)     The Defendants' unlawful conduct had the following effects:  (1) Automotive Constant-Velocity-Joint Boot Product price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Constant-Velocity-Joint Boot Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Constant-Velocity-Joint Boot Products.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of the Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

(e)     The Defendants' deception, including their omissions concerning the price of Automotive Constant-Velocity-Joint Boot Products, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Automotive Constant-Velocity-Joint Boot Products at prices born by a free and fair market.  The Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### on behalf of Plaintiffs and the Damages Class

291.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

292.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra.*, except California.  Plaintiffs also bring this claim under the laws of Missouri, Massachusetts and Illinois on behalf of the Plaintiffs who have their primary places of business in those three states and the class members in those three states.

293.     As a result of their unlawful conduct described above, the Defendants have and will continue to be unjustly enriched. The Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Constant-Velocity-Joint Boot Products.

294.     The Defendants have benefited from their unlawful acts and it would be inequitable for the Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Automotive Constant-Velocity-Joint Boot Products.

295.     Plaintiffs and the members of the Damages Class are entitled to the amount of the Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

296.     Pursuit of any remedies against the firms from whom Plaintiffs and the Class members purchased vehicles containing Automotive Constant-Velocity-Joint Boot Products and Automotive Constant-Velocity-Joint Boot Products subject to the Defendants' conspiracy would have been futile, given that those firms did not take part in the Defendants' conspiracy.

## <u>PRAYER FOR RELIEF</u>

Accordingly, Plaintiffs respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be

adjudged and decreed:

       (a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

       (b)     A *per se* violation of Section 1 of the Sherman Act; and

       (c)     Acts of unjust enrichment by Defendants as set forth herein.

       (d)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against the Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     The Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     Plaintiffs and the members of the Damages Class be awarded restitution,

including disgorgement of profits the Defendants obtained as a result of their acts of unfair competition and unjust enrichment;

   G.  Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

   H.  Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

   I.  Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## **JURY DEMAND**

   Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

   Dated:  December 22, 2014.

          Respectfully submitted,


        /s/  *Gerard V. Mantese*
        Gerard V. Mantese
        (Michigan Bar No. P34424)
        David Hansma
        (Michigan Bar No. P71056)
        Brendan Frey
        (Michigan Bar No. P70893)
        Mantese Honigman Rossman and
        Williamson, P.C.
        1361 E. Big Beaver Road
        Troy, Michigan 48083
        Telephone: (248) 457-9200
        gmantese@manteselaw.com
        dhansma@manteselaw.com
        bfrey@manteselaw.com

Don Barrett
Brian Herrington
David McMullan
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Shawn M. Raiter
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com

Phillip Duncan
Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com

Dewitt Lovelace
Valerie Nettles
Lovelace & Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Yifei Li
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Michael J. Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker
Suite 801
St. Louis, MO  63101
Telephone:  (314) 226-1015
mflannery@cuneolaw.com
Thomas P. Thrash
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com

Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
greg@gjohnsonlegal.com

*Attorneys for Dealership Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

        I hereby certify that on December 22, 2014 I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

                        __/s/ Brendan Frey _____
                        Brendan Frey (Michigan Bar No. P70893)
                        Mantese Honigman Rossman
                         and Williamson, P.C.
                        1361 E. Big Beaver Road
                        Troy, Michigan 48083
                        Phone: (248) 457-9200 ext. 203
                        Fax: (248) 457-9201
                        Email: bfrey@manteselaw.com